# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF KENTUCKY
## NORTHERN DIVISION AT COVINGTON

CIVIL ACTION NO.: 2:17-CV-00049 (WOB-CJS)

ALLSTATE INSURANCE COMPANY                                    PLAINTIFF

V.                        <u>MEMORANDUM OPINION AND ORDER</u>

CHRISTA RUBER HAMM, ET AL.                                    DEFENDANTS

Plaintiff Allstate Insurance Company alleges that the defendants Christa Ruber Hamm and David Worthington breached their contracts with Allstate through improper solicitation and retention of confidential customer information. Allstate also alleges that Hamm and Worthington, as well as their new insurance agency, engaged in other improper actions. Defendants counterclaim against Allstate.

This matter is before the Court on its *sua sponte* reconsideration of whether any triable issues of fact exist.

The Court previously advised counsel that it would revisit this issue at the final pretrial conference. (Doc. 119). That conference was held telephonically on March 13, 2020. During the conference, Allstate abruptly abandoned its claim for significant damages flowing from defendants' alleged improper solicitation of customers, which Allstate had itemized in its final pretrial memorandum. (Doc. 129 at 3; Doc. 116-3 at 2). The Court thereafter allowed Allstate to file an additional statement of the case, which it did. (Doc. 130). Defendants filed a response the following day, (Doc. 131), and Allstate filed a reply. (Doc. 132).

Although the Court previously denied the parties' motions for summary judgment (Doc. 79), a thorough review of the entire record, including the parties' pretrial and recent filings, now leads the Court to conclude that, in fact, no triable issues exist.

The Court therefore issues the following Memorandum Opinion and Order.

### Factual and Procedural Background

**1. The contractual agreements between Hamm, Worthington, and Allstate.**

In July of 2011, Christa Ruber Hamm entered into an Exclusive Agency Agreement[1] ("EA Agreement") with Allstate Insurance Company ("Allstate") and thereby became an Exclusive Agent of Allstate. (Doc. 1 ¶¶ 1-2; Doc. 50 at 2). Hamm[2] entered this business relationship through her father, David Worthington: he had worked as an agent for Allstate and sold his agency to Hamm when he retired. (Hamm Dep., Doc. 53 at 11). He continued working for Allstate through Hamm's agency in a limited capacity. (*Id.*).

The EA Agreement contains several provisions relevant to the current matter. First, the EA Agreement contained a "Confidentiality and Non-Competition Agreement." (Doc. 1-1 at 41). While Worthington did not execute an EA Agreement, he did sign a "Confidentiality and Non-Competition Agreement." (Doc. 1-2). This Agreement defines "Confidential Information" to include "information regarding the names, addresses, and ages of policyholders or prospective policyholders of the Company[.]" (Doc. 1-1 at 41). Hamm and Worthington agreed never to disclose any confidential information to a third party or use any confidential information for their

---

[1] As part of its terms, the EA Agreement expressly incorporated the Supplement for the Agreement ("Supplement") and the Exclusive Agency independent Contractor Manual ("Manual"). (Doc. 1-1 at 29). Hamm's Agreement is technically titled the "Allstate R3001C Exclusive Agency Agreement" and is often referenced as the "R3001 Agreement" in Allstate documents.

[2] At the time of this Agreement, Hamm's last name was Ruber. (*See* Doc. 1-1 at 40; Hamm Dep., Doc. 53 at 6). Since Hamm is her current last name, she is referred to as "Hamm" throughout this Opinion. Any reference to "Ruber" in the record is a reference to Hamm.

own benefit. (*Id.*). Further, these Agreements acknowledged that this confidential information was Allstate's property and was to be returned to Allstate upon termination of their employment. (*Id.*).

These Agreements also contain a non-solicitation provision. Unlike the Confidential Information prohibition, this provision only applied for one year following termination. (*Id.* at 42). Hamm and Worthington both agreed not to solicit:

1. [w]ith respect to any person, company, or organization to whom Agency, or any person employed by Agency, including Service Provider, sold insurance or other products or services on behalf of the Company, and who is a customer of the Company at the time of the termination; or
2. [w]ith respect to any person, company, or organization who is a customer of the Company at the time of the termination and whose identity was discovered as a result of access to confidential information of the Company; or
3. [f]rom any office or business site located within one mile of any locations from which Agency solicited or sold Company insurance or other products or services during the year immediately preceding the termination.

(*Id.* at 42).[3]

The EA Agreement also recognized that, as an agent, Hamm had an "economic interest in the Allstate customer accounts" she developed. (Doc. 52-1 at ALLSTATE-000046) (emphasis deleted). Upon termination, Hamm could either sell her economic interest—commonly referred to as the "book of business"—to an approved buyer or receive a termination payment provision ("TPP") from Allstate. (*Id.* at ALLSTATE-000069; Barnett Dep., Doc. 55 at 79). When an agent receives the TPP, she normally earns about 2.5 times the value of her book of business. (Hamm Dep., Doc. 53 at 44; Worthington Dep., Doc. 54 at 20). Payment is made in 24 monthly installments and "is subject to compliance with the terms of the confidentiality and non-competition provisions of the R3001 Agreement, which survive termination of the agreement." (Doc. 52-2 at ALLSTATE-000184). When Allstate repurchased a book and issued a TPP, it would

---

[3] Allstate has not alleged any conduct that would violate the third form of solicitation.

sometimes divide up the departing agent's clients among other agents. (Barnett Dep., Doc. 55 at 82).

If an agent wanted to avoid selling their book back to Allstate, they could sell their book to another agent. Selling this way is often preferred for both the agent and Allstate since it allows the agent to receive more money than the TPP and it keeps the book of business intact. (*Id.* at 83; Hamm Dep., Doc. 53 at 44-45). The departing agent is responsible for negotiating the terms of any sale, but Allstate has an absolute right to approve or disapprove the sale "up until the time the transfer of the economic interest has occurred." (Doc. 52-1 at ALLSTATE-000076-77, ALLSTATE-000079). If an agent wants to sell to another agent, the potential buyer must meet Allstate's qualifications. (*Id.* at ALLSTATE-000077). This includes business results, company compliance, and award levels. (Barnett Dep., Doc. 55 at 59-60; Conlan Dep., Doc. 56 at 25-26).

Lastly, Hamm was contractually required to "obtain and maintain the Series 6 and Series 63 (where required by state law) licenses" within 24 months of the effective date of the EA Agreement. (Doc. 52-1 at ALLSTATE-000057). If she failed to do so, this could constitute grounds for termination. (*Id.*).

## 2. Hamm's termination.

When Hamm became an agent in 2011, she did not have the Series 6 and Series 63 licenses and, therefore, had two years to obtain those licenses. (Hamm Dep., Doc. 53 at 17-20). Due to a series of events, including the sudden loss of her husband, Hamm did not earn these within the two-year period. (*Id.* at 20). Allstate gave her additional time to satisfy these requirements: she had until July 13, 2015, to earn her Series 63 license and December 2, 2015, for the Series 6 license. (*Id.* at 20; Doc. 50-4 at 323). Hamm registered to take the Series 63 exam on July 9, 2015, but failed to take the exam. (Doc. 50-5; Hamm Dep., Doc. 53 at 25-56). She registered to take the

Series 6 exam on August 28 but ended up being admitted to the hospital that day. (Hamm Dep., Doc. 53 at 29-30).

Because Hamm failed to earn these licenses, Allstate terminated her employment. (Doc. 50-9 at DEF000001). Jim Conlan, an Allstate strategic deployment leader, was involved in deciding to let Hamm go. (Conlan Dep., Doc. 56 at 11, 32). Allstate notified Hamm of her termination in September of 2015 and it was set to become effective on December 30, 2015. (Doc. 50-9 at DEF000001). The letter also reminded Hamm of her ability to sell her book of business or to receive the TPP if she complied with the confidentiality and non-solicitation provisions. (*Id.*).

### 3. **Hamm attempts to sell her book of business**.

Upon receiving this notice, Hamm tried to find a buyer for her book of business.[4] (Hamm Dep., Doc. 53 at 36). Worthington offered to buy it but was rejected by Allstate. (Worthington Dep., Doc. 54 at 76-77). Conlan testified that Worthington was rejected because he failed to meet approved production and award levels when he was still an agent. (Conlan Dep., Doc. 56 at 28, 50-51). Worthington admitted that his production levels failed to meet award levels in his last years as an agent. (Worthington Dep., Doc. 54 at 12).

Hamm also spoke with agents Dennis Grothaus and Hans Philipo to see if they would buy her book of business. (Hamm Dep., Doc. 53 at 52). Negotiating the price was the selling agent's responsibility and Hamm hoped to receive two or 2.5 times what the book was worth from Grothaus or Philipo, respectively. (Worthington Dep., Doc. 54 at 85-88). Hamm believed both were good candidates because they were already agents, but she admitted that she did not know their production levels when she was negotiating with them. (Hamm Dep., Doc. 53 at 54-56).

---

[4] Hamm was involved in finding a buyer, but Worthington was the one who primarily spoke to potential buyers and discussed prices. (Hamm Dep., Doc. 53 at 49; Worthington Dep., Doc. 54 at 85-88).

Neither agent was approved by Allstate. Tammy Barnett, an Allstate field sales leader, often made recommendations to Allstate on whether an agent would be a good candidate to buy a book of business. (Barnett Dep., Doc. 55 at 16, 66). Barnett did not recommend Grothaus because he was the "lowest performing agent" in her jurisdiction. (*Id.* at 99). Conlan agreed that Grothaus's numbers were below average. (Conlan Dep., Doc. 56 at 36-37). Philipo was similarly rejected for failing to meet production levels. (*Id.* at 34). Importantly, when deciding whether to approve Grothaus or Philipo, Conlan did not know the prices they had discussed with Hamm for the book's sale. (*Id.* at 36, 38).

Dane Farrar was a new agent who was approved by Allstate to buy Hamm's book. (*Id.* at 43-44). Because Farrar was interested in the sale, Allstate pushed back the effective date of Hamm's termination to January 31, 2016. (Hamm Dep., Doc. 53 at 6471, 73). Unfortunately, Farrar's offer for the book was not much better than the TPP. (Farrar Dep., Doc. 57 at 24; Doc. 50 at 7-8). Further lessening the appeal, his offer would have required Hamm to hold a note for $70,000. (Farrar Dep., Doc. 57 at 24).

Because Farrar's offer was low, Hamm declined it and accepted the TPP from Allstate. (Hamm Dep., Doc. 53 at 70-71, 91-92). Allstate thereafter divided Hamm's customers among its agents and some were reassigned to Farrar. (*See* Caldwell Dep., Doc. 60 at 36; Dunn Dep., Doc. 58 at 42). Grothaus—who had been rejected as a buyer of Hamm's book—also received some of Hamm's clients. (Doc. 52-4 at 908).[5]

---

[5] Upon reassignment, commission payments vary. An agent's base commission rate is normally 9%. (Barnett Dep., Doc. 55 at 74). However, an agent who receives clients through reassignment receives 6% commission until they own the policy for five years—thereafter, they earn the typical 9% commission. (*Id.* at 82-83). If an agent receives a client as a service agent, though, they will not ever obtain ownership over the policy and only receive 3.5% commission. (*Id.*; Farrar Dep., Doc. 57 at 30-31). Farrar received 3.5% commission on the clients he gained from Hamm's book of business. (Farrar Dep., Doc. 57 at 30). If an agent acquires clients by purchasing the book of business, the purchasing agent receives a higher commission. (*See* Barnett Dep., Doc. 55 at 70-76).

### 4. Events following Hamm's decision to receive the TPP and her termination.

A few days before Hamm's termination became effective on January 31, 2016, Barnett and another Allstate employee shut down Hamm's office. (Barnett Dep., Doc. 55 at 120-21). Barnett used a checklist to complete this task and believed she did all that was necessary to successfully stop operations. (*Id.* at 121, 123). Hamm testified that she had physical copies of client files in her cabinets and that Barnett took them all. (Hamm Dep., Doc. 53 at 36, 98). Barnett testified that, to her knowledge, "we secured everything that was in that office" and she did not see any extra copies of files. (Barnett Dep., Doc. 55 at 123, 129).

Hamm also had access to Allstate's electronic database. The database is stored online, but a user can download information from the database onto computers. (Barnett Dep., Doc. 55 at 125-27). Hamm testified that her access to the database ended around the time that Barnett shut down her office. (Hamm Dep., Doc. 53 at 99-100). Hamm and Worthington both testified that they had not downloaded any information onto their computers prior to losing that access. (Hamm Dep., Doc. 53 at 100; Worthington Dep., Doc. 54 at 54). Barnett testified that she did not observe any electronic copies or downloaded information, but she also stated that she did not perform a "sweep of the files" to see what was saved on the computers. (Barnett Dep., Doc. 55 at 132, 174). Hamm and Worthington had purchased their computers while working with Allstate and took the computers with them to their new business. (Worthington Dep., Doc. 54 at 50-51). They began having issues with these computers, so they replaced the units with new ones after about nine months. (*Id.* at 52-53).[6]

---

[6] In this regard, the Court finds Allstate's entire spoliation argument to be without merit, particularly as it is set forth in Allstate's most recent reply brief. (Doc. 32). First, it rests on a faulty premise. The record is undisputed that Hamm and Worthington did not download confidential information to their laptops, and the fact they later discarded the laptops after they bought new ones does not constitute "spoliation." Second, Allstate raises no triable issue by citing to the forms that Hamm and Worthington had customers sign when the customers, *on their own volition*, brought their business to defendants' new agency. Allstate's argument that these forms are evidence of some improper motive simply does not comport with the record.

At no point prior to the effective date of her termination on January 31, 2016, had Hamm told any customer that they were closing their Allstate office. (Hamm Dep., Doc. 53 at 94-95). On February 1, 2016, Hamm and Worthington opened Worthington Insurance Group ("WIG"). (*Id.* at 107-08). They originally told only acquaintances who were not Allstate customers that they had opened another business. (*Id.* at 112).

Hamm did respond to a Facebook post that concerned Allstate and her former customers' policies after starting WIG and before her one-year solicitation prohibition had expired. (*See* Doc. 50-23 ¶ 4, DEF000610). One of Hamm's Allstate customers, Angel Jordan, posted a message on Facebook advising other Allstate policyholders to check the current status of their policies because she had recently encountered issues with her coverage. (Doc. 50-23 at DEF000610). Hamm commented on post that her former clients' policies "are in fact fine" and "[t]here is no need to worry about your policy." (*Id.* at DEF000611). She said that she was no longer selling with Allstate, but "[t]his in no way has any effect on your current policy or policies." (*Id.*). She then said that if anyone had questions about their Allstate policies, "I can get you to the right people that can help you" or if people had "insurance questions in general[,] feel free to call me or stop by my new location." (*Id.*). She then included the name and address of WIG.

On February 1, 2017—one year after her termination and, therefore, after the non-solicitation provision had expired—Hamm sent out a letter to about 100 of her former Allstate customers. (Hamm Dep., Doc. 53 at 118-19; Doc. 50-15). This letter informed her customers that their Allstate office had closed and that they had opened a new agency, WIG. (Doc. 50-15). It listed the address and phone number for WIG and informed readers that they would like to work with their former clients again. (*Id.*).

This letter apparently caused Allstate to suspect that Hamm had retained former clients' names and addresses. (Barnett Dep., Doc. 55 at 133-34, 148; Conlan Dep., Doc. 56 at 70). Hamm testified that she did not retain or use any Allstate property to compile client information. Hamm explained her process in creating and sending the letters as such: she would run into people around town and remember that they were her Allstate customers, and she would then look up their addresses using public sources such as the Internet and White Pages. (Hamm Dep., Doc. 53 at 120). She was also able to remember clients from her time with Allstate because it is a small town and they tended to know most people there. (*Id.* at 121). Hamm was adamant that they "had no files, . . . no copies, . . . [w]e had nothing. So I didn't have anything to get information from" any Allstate property. (*Id.* at 121-22).

Farrar testified that, during the year following Hamm's termination, he heard from customers that they had been solicited by the defendants or that the defendants had retained their information:

1. Diana Dunn was allegedly stopped in the grocery store by Worthington and told she needed to leave Allstate (Farrar Dep., Doc. 57 at 72-73);

2. Steven Fryman allegedly told Farrar's office that Hamm had given Fryman her cell phone number and offered to get him a new quote (*Id.* at 49-50; Doc. 50-16 at ALLSTATE-000558); and

3. Thomas Caldwell had been told by Worthington that Worthington had kept Caldwell's file. (Farrar Dep., Doc. 57 at 68-69).

In their most recent filing, Allstate also identified emails in Farrar's files concerning alleged solicitation of Dianna Adams and Mark Payton. (Doc. 130 at 9). Farrar testified that he

has no independent knowledge that these alleged incidents, which will be discussed below, actually occurred. (*Id.* at 50, 69, 74).

Allstate stopped Hamm's TPP payments in February of 2017. (Doc. 50-10 ¶ 9; Doc. 61 at 13-14). It has paid $132,279.39 of the $244, 392.83 owed to her. (Doc. 50-10 ¶ 9).

### 4.  Procedural History.

Allstate filed this suit against Hamm, Worthington, and WIG  in March of 2017, alleging: (1) breach of contract against Hamm and Worthington based on the non-solicitation and confidentiality provisions of their respective agreements with Allstate; (2) violation by all defendants of the federal Defend Trade Secrets Act and the Kentucky Uniform Trade Secrets Act; (3) tortious interference with contractual relationships against WIG; (4) tortious interference with business relationships claim against all defendants; and (5) unfair competition against all defendants.

Defendants assert counterclaims against Allstate for: (1) breach of the implied covenant of good faith and fair dealing by not approving any buyer that Hamm and Worthington presented for Hamm's book of business, essentially forcing Hamm to accept the TPP; and (2) breach of contract based on Allstate's cessation of TPP payments to Hamm.  (Counterclaims, Doc. 23 at 23-34).

The parties began exchanging information shortly after filing suit. In response to the defendants' interrogatories, Allstate identified 11 customers they alleged the defendants solicited or maintained their Allstate files or other confidential information. (Doc. 50-18 at 362-63). Included in this list were Dunn, Fryman, and Caldwell, whom Farrar had specifically mentioned. Two of the identified clients were deceased; defendants produced affidavits from four of the clients

stating they were not solicited prior to the February 1, 2017, letter, nor did they believe that the defendants had retained their confidential information. (Docs. 50-19, 50-20, 50-21, 50-23).

Dunn, Fryman, and Caldwell signed similar affidavits. In their depositions, these witnesses testified that they had not fully read the affidavit or that they read them in a hurry before signing it. (Dunn Dep., Doc. 58 at 33; Caldwell Dep., Doc. 60 at 28; Fryman Dep., Doc. 59 at 12-13, 27).

Nonetheless, Fryman and Caldwell both affirmatively testified that they were not improperly solicited. (Fryman Dep., Doc. 59 at 52; Caldwell Dep., Doc. 60 at 19, 60). Fryman was adamant that any contact between him and Hamm was initiated only by him since he was "always looking." (Fryman Dep., Doc. 59 at 52). While Dunn could not remember when she received the letter, she testified that the February 1, 2017, letter is the only contact she received from the defendants. (Dunn Dep., Doc. 58 at 28). None of these witnesses remembered the defendants retaining any of their information. (*Id.* at 53; Fryman Dep., Doc. 59 at 57, 62-63; Caldwell Dep., Doc. 60 at 43-44, 60).

Moreover, none of these witnesses recalled any of the incidents described by Farrar. Dunn did not remember Worthington ever stopping her in the grocery store to ask her to switch insurance providers. (Dunn Dep., Doc. 58 at 46-47). Fryman did not remember saying that Hamm offered to give him a new quote, and he testified that he never heard from Hamm or Worthington after they left Allstate until 2018 when he reached out to Hamm for a quote. (Fryman Dep., Doc. 59 at 41-43, 47). Caldwell does not remember saying that Worthington told him he retained Caldwell's information. (Caldwell Dep., Doc. 60 at 37, 41-42). Thus, every incident retold by Farrar was denied by the people who were allegedly involved.

Finally, at the time of their depositions in late 2018, both Dunn and Caldwell were still with Allstate, and Fryman testified that he moved to WIG in May or June 2018, long after the

expiration of the non-solicitation clauses at issue. (Dunn Dep., Doc. 58 at 10; Caldwell Dep., Doc. 60 at 17-19; Fryman Dep., Doc. 59 at 37-38).

## *Analysis*

### 1. **Legal standards for summary judgment.**

Both parties have moved for summary judgment on their opposing parties' claims. "Summary judgment is proper if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Pittman v. Experian Info. Sols., Inc.*, 901 F.3d 619, 627 (6th Cir. 2018) (internal quotations omitted). Once the movant has satisfied this initial burden, the non-moving party "must do more than rely merely on the allegations of her pleadings or identify a metaphysical doubt or hypothetical plausibility based on a lack of evidence; she is obliged to come forward with *specific facts*, based on discovery and disclosure materials on file, and any affidavits[] showing that there is a genuine issue for trial." *Chappell v. City of Cleveland*, 585 F.3d 901, 912 (6th Cir. 2009) (internal quotations omitted) (emphasis added). There must be "significant probative evidence tending to support [the non-movant's] version of the facts, *evidence* on which a reasonable jury could return a verdict for her." *Id.* at 913 (emphasis in original). Thus, to defeat a proper motion for summary judgment, a non-movant must support her own version of the facts with appropriate evidence from the record.

When a party moves for summary judgment on a claim on which she bears the burden of persuasion at trial, the burden is heightened. "[T]he party's initial summary judgment burden is higher in that it must show that the record contains evidence satisfying the burden of persuasion

and that the evidence is so powerful that no reasonable jury would be free to disbelieve it." *Surles v. Andison*, 678 F.3d 452, 455-56 (6th Cir. 2012) (internal quotations omitted). Here, Hamm also moved for summary judgment on her counterclaims. Her counterclaims are based on her contract with Allstate and are, therefore, necessarily intertwined with Allstate's contractual claims: both parties allege that the other party breached first. Hence, deciding whether Hamm is entitled to summary judgment on Allstate's claim of breach overlaps with her own claim for breach.

>    2. **Hamm is entitled to summary judgment on Allstate's claim of breach and on her counterclaim for breach.**
>
>       a. **Allstate cannot establish that there is a genuine dispute as to whether Hamm and Worthington breached their contracts.**

In Kentucky,[7] a plaintiff must establish three elements in a claim for breach of contract: (1) the existence of a contract; (2) breach of the contract; and (3) damages flowing from the breach. *Abell v. Sky Bridge Res., LLC*, 715 F. App'x 463, 467 (6th Cir. 2017) (applying Kentucky law). It is worth noting two undisputed factors that frame this issue. The first is that defendants Hamm and Worthington signed "Confidentiality and Non-Competition Agreements," which survived the end of their working relationship and whose satisfaction were preconditions to Hamm's receipt of the TPP. (Doc. 50 at 3, 34; Doc. 61 at 4-5). The second is that Allstate stopped paying the TPP before it had distributed the full amount to Hamm. (Doc. 61 at 4; Doc. 50 at 15). Allstate claims that it stopped paying because the defendants violated the non-solicitation and confidential information provisions. (Doc. 61 at 12-14).

Allstate, however, has no admissible evidence to support its theory that the defendants were the breaching parties. Allstate identified 11 witnesses who it believed were unlawfully solicited or

---

[7] Because this action is based on diversity jurisdiction, the Court applies the substantive law of the state. *Shropshire v. Laidlaw Transit, Inc.*, 550 F.3d 570, 573 (6th Cir. 2008).

whose information was retained by the defendants. (Doc. 50-18 at 362-63). Yet there is affirmative evidence in the record from seven of these witnesses that clearly establishes they were not solicited, nor was their information retained.[8] The defendants obtained affidavits from four of these clients—Angel Jordan, Phyllis Marhoffer, Earl Hampton, and Lyndsie McCowan—who swore that they were not solicited prior to the February 1, 2017, letter and that these clients did not believe that the defendants had retained any of their confidential information. (Docs. 50-19, 50-20, 50-21, 50-23). Allstate has not attempted to challenge any of these affidavits or the testimonies contained therein.

Three other clients—Dunn, Caldwell, and Fryman—signed the same affidavits. As noted above, these clients were deposed by Allstate and they testified that they did not fully read the affidavits before signing them or read them in a hurry. (Doc. 71 at 5-6, 8). However, as the defendants correctly note, each of these clients nonetheless clearly testified that they were not improperly solicited. (Caldwell Dep., Doc. 60 at 15-16, 60; Fryman Dep., Doc. 59 at 30). Fryman stated that "Christa's never asked me for my business" and said that he had never been solicited in general. (Fryman Dep., Doc. 59 at 52-53). While Dunn could not remember the specific date that she received a letter from the defendants, she identified the February 1, 2017, letter as the only communication she received from them and had no reason to doubt the date stated on the letter. (Dunn Dep., Doc. 58 at 28, 59). Further, each witness was adamant that they had no reason to believe that any of their information was retained. (*Id.* at 61; Fryman Dep., Doc. 59 at 57; Caldwell Dep., Doc. 60 at 60). Thus, each witness identified by Allstate who was available to provide

---

[8] As simple math reveals, then, if only seven of the eleven have affirmative evidence of non-solicitation and retention of information, then the same must not be true for the remaining four clients. Two of these clients, Mark Payton and Lewis Coppage, are deceased. (Doc. 50-18 at 363). The other two are Helen Mann and Dianna Adams and there is no information in the record concerning either of them. Consequently, there is no way to know whether they were solicited or if their information was retained.

information specifically refuted what Allstate claimed—that they were solicited or their information was retained.

In order to avoid summary judgment on this issue, then, Allstate must provide *specific facts* from the record to show that there is a genuine dispute. This must be "significant probative evidence tending to support [its] version of the facts, evidence on which a reasonable jury could return a verdict for [it]." *Chappell*, 585 F.3d at 913 (emphasis deleted).

Allstate falls back on credibility issues supposedly created during Dunn's, Caldwell's, and Fryman's depositions. Allstate argues that a jury could disbelieve these witnesses and find them unreliable because they failed to appreciate the seriousness of the affidavits. (Doc. 71 at 4-5). This is a red herring. The Court has carefully re-read these depositions and rejects Allstate's argument. Read in their entirety, these witnesses' testimony provides no basis from which a reasonable jury could find that Hamm or Worthington improperly solicited customers or retained their information.

Allstate also relies on incidents of possible solicitation and retention of information as retold by Farrar. Farrar testified that Dunn, Fryman, and Caldwell contacted his office with stories of improper conduct since Dunn was supposedly solicited by Worthington in the grocery store; Hamm allegedly told Fryman she would get him a new quote; and Worthington allegedly told Caldwell that he had kept Caldwell's information. (Farrar Dep., Doc. 57 at 46-50; 68-69; 72-73). However, because the incidents as retold by Farrar are being offered for their truth, they are hearsay. *See* Fed. R. Evid. 801(c). At the summary judgment stage, evidence can be submitted in inadmissible forms as long as the content itself is admissible. *See Alexander v. CareSource*, 576 F.3d 551, 558 (6th Cir. 2009). Allstate has not offered any route through which these stories may be admitted. It is undisputed that Farrar himself has no personal knowledge regarding these alleged events. (Farrar Dep., Doc. 57 at 50, 69, 74).

The same is true of two individuals Allstate identified in its recent filing. (Doc. 130 at 9). The email recounting an alleged incident in which Dianna Adams was solicited by Worthington is textbook hearsay, and Allstate has provided no testimony from Adams herself, noting in its final pretrial filings that her current contact information is "unknown." (Doc. 92 at 8). An email regarding customer Mark Payton likewise is hearsay, and Allstate has noted that he is now deceased. (Doc. 50-18 at 363).

While the customers who allegedly described these incidents to Farrar could obviously testify about them, *see Jones v. UPS Ground Freight*, 683 F.3d 1283, 1294 (11th Cir. 2012), each identified witness did not remember any of these instances ever occurring. Dunn, Fryman, and Caldwell clearly and unequivocally stated that they did not remember any of the incidents described by Farrar. (Dunn Dep., Doc. 58 at 46-47; Fryman Dep., Doc. 59 at 42-43; Caldwell Dep., Doc. 60 at 41-43). Since they cannot remember any of these alleged encounters, Allstate cannot rely on them to make the inadmissible admissible at trial and these alleged incidents may not be considered at this stage. *See Alexander*, 576 F.3d at 558 ("[H]earsay evidence must be disregarded.") (internal quotations and alterations omitted).

Allstate relies on the fact that none of the witnesses could affirmatively deny that the incidents described by Farrar occurred, but a more accurate depiction of their testimony is that they could not affirmatively deny these incidents because they could not remember them. Allstate apparently expected these witnesses to say under oath that these events certainly never happened, which necessarily required calling Farrar a liar of some sort,[9] when they had no recollection of

---

[9]Allstate's counsel asked each of them if they believed that Farrar would have any reason to make up these stories and they replied that they did not believe so while stating that they still did not remember these events. (Dunn Dep., Doc. 38 at 47-50; Fryman Dep., Doc. 59 at 44; Caldwell Dep., Doc. 60 at 42-43). This line of questioning possibly put Dunn and Caldwell in particularly awkward positions because Farrar is now their Allstate agent. (Dunn Dep., Doc. 58 at 10; Caldwell Dep., Doc. 60 at 35-36).

them. These witnesses did the most that they seemingly felt comfortable doing in the situation: they stated, repeatedly, that they did not remember the described incidents while acknowledging it was possible they had forgotten events that had actually occurred. Rather than making them seem unreliable, this testimony seems prudent since these witnesses were being asked under oath to deny something of which they had no recollection.

Allstate has to do more than "rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact [and] must make an affirmative showing with proper evidence in order to defeat the motion." *Alexander*, 576 F.3d at 558 (internal quotations omitted). Allstate has not put forth evidence to dispute the testimonies of Dunn, Caldwell, or Fryman—it merely hopes that the Court will find a genuine dispute based on the possibility that they collectively forgot the incidents described by Farrar. This is not a specific fact that satisfies Allstate's burden.

Consequently, to establish that Hamm and Worthington violated the non-solicitation provision, Allstate is left with its lone piece of affirmative evidence—the Facebook post. Hamm admits that Jordan, the original writer of the Facebook post, was one of Hamm's Allstate clients. (Doc. 50 at 12). This could violate the non-solicitation provision if Hamm's comment on the post constituted solicitation, then.

Solicitation is not defined in the contract, so the Court uses its ordinary meaning. *Kentucky Shakespeare Festival, Inc. v. Dunaway*, 490 S.W.3d 691, 694 (Ky. 2016). To solicit is to "(1) make petition to; entreat; to approach with a request or plea; (2) to urge (something, such as one's cause) strongly; (3) to entice or lure . . . (4) to try to obtain by usually urgent requests or pleas." *Solicitation* MERRIAM-WEBSTER, https://www.merriam-webster.com/dictionary/solicit (last visited March 19, 2020). Another court in this district used this same dictionary definition when defining solicitation in a similarly worded non-solicitation provision. *See Wells v. Merrill Lynch,*

*Pierce, Fenner & Smith, Inc.*, 919 F. Supp. 1047, 1049, 1053 (E.D. Ky. 1994). "The Court analyzed the meaning of the term 'solicit' in the Merrill Lynch non-solicitation agreement . . . [and] the *Wells* Court found that 'mere informational contact' with a former client did not constitute solicitation under the employment agreements." *Branch Banking & Tr. Co. v. Jones*, No. 5:18-cv-610-JMH, 2018 WL 6331684, at *4 (E.D. Ky. Dec. 4, 2018). The *Wells* Court defined "informational contact" as "any written or oral contact that provides information about the plaintiffs' whereabouts and how they may be contacted." 919 F. Supp. at 1053.

This analysis is equally applicable here. At most, Hamm's message could be seen as an informational contact. Hamm's comment on the Facebook post was not initiated by Hamm but was made only in response to Jordan's concerns about her Allstate policies. When looking at the overall message of Hamm's comment, it becomes clear that she was not approaching any reader with a specific request or petitioning anyone to employ her services. Rather, she was assuring readers that they had no reason to worry about their Allstate policies. While Hamm included a general invitation for clients to come to her new office if they wanted, this does not change the fact that her message clearly conveyed that her former clients' policies *with Allstate* were fine and would continue to be fine. Hamm did not attempt to lure any reader away from Allstate, but instead assured them that they could stay with Allstate and offered to provide contact information for Allstate agents. This cannot not reasonably be construed as solicitation and fails to create a triable issue. Consequently, Allstate has no affirmative evidence of any breach of the non-solicitation provision.

Allstate's claim based on the confidential property provision fails for similar reasons: there is simply nothing in the record to create a genuine question as to whether the defendants retained any confidential information. Allstate's theory centers around the February 1, 2017, letter. In its

response to the defendants' motion, however, Allstate mischaracterizes Hamm's testimony by saying that Hamm testified to running into 100 people and looking up their addresses to send the February 1 letter all within 24 hours. (Doc. 71 at 9).

When Hamm was deposed, she described the process she used to create and send out these letters. (Hamm Dep., Doc. 53 at 119-21; *see also* Worthington Dep., Doc. 54 at 158-60). Hamm testified that she would see people while going through town, as her non-solicitation year progressed, and then would look up their addresses in what Allstate itself described as an ad hoc basis. (Hamm Dep., Doc. 53 at 120). Worthington—who was not very involved in preparing the letters[10]—supplied Allstate with the idea that this all somehow occurred in a day: when he said that the client list was created close in time to the date the letters were sent out, *Allstate* then asked if it happened within a day. (Worthington Dep., Doc. 54 at 158-60). Worthington simply agreed. (*Id.* at 160).

The relevant issue is not how long it took the defendants to prepare and send out the letter— it is whether Allstate can point to specific facts that create an issue as to whether the defendants retained and used Allstate's confidential information in preparing the letters. While Worthington may have characterized the process differently from Hamm as far as regarding how long it took to prepare the letters, his testimony on how they acquired names and addresses is the same: they both were clear that they did not use any Allstate information but used their memories and publicly available sources to identify clients and find their addresses. (*Id.* at 158; Hamm Dep., Doc. 53 at 120-22). Conlan himself stated that he did not believe using one's memory and public sources to compile such a list would violate the confidential information provision. (Conlan Dep., Doc. 56 at 71).

---

[10] Worthington was not confident that he was even in the office on the day they sent out the letters. He "would say yes" but was not sure. (Worthington Dep., Doc. 54 at 160).

For these reasons, the defendants' motion for summary judgment on Allstate's breach of contract claims (Counts I and II) will be granted.

### b. Hamm is entitled to summary judgment on her breach of contract claim.

The defendants counterclaim that Allstate breached the agreements when it stopped Hamm's TPP payments. (Doc. 23 Counterclaims ¶¶ 59-62). Hamm moved for summary judgment on her claim[11] and Allstate also moved for summary judgment on this claim. (Doc. 50 at 33; Doc. 61 at 12). Again, it is undisputed that Allstate stopped paying Hamm the TPP. The TPP is dependent upon the confidentiality and non-solicitation provisions, which survived the termination of the Agreement. Thus, if Hamm breached either, Allstate would be relieved from having to pay the TPP. *See Pace v. Burke*, 150 S.W.3d 62, 66 (Ky. Ct. App. 2004).

For the reasons discussed above, though, there is no genuine question as to whether Hamm breached these provisions. In its motion, Allstate argues that Hamm breached because she retained

---

[11] Allstate notes that the Counterclaims are asserted on behalf of all three defendants—Hamm, Worthington, and WIG. (Doc. 61 at 7 n.1). However, as Allstate points out, the counterclaims are based entirely on contractual obligations Allstate owed to Hamm that are rooted in the EA Agreement, which only Hamm signed. (*Id.*). "Parties may only sue for a breach of contract if privity of contract existed." *Double C Entm't, Inc. v. Palace Theatre Operating Grp., LLC*, No.3:11-CV-98-CRS, 2011 WL 5903606, at *1 (W.D. Ky. Nov. 25, 2011) (citing *Presnell Constr. Managers, Inc. v. EH Constr., LLC*, 134 S.W.3d 575, 579 (Ky. 2004)). For WIG, it is clear that WIG never entered into any contractual relationship with Allstate. Worthington testified to only signing the non-compete agreement with Allstate when he stayed on to help Hamm. (Worthington Dep., Doc. 54 at 23). Thus, while Worthington did enter into a contract with Allstate, this does not establish—nor do the defendants allege—that Worthington had any comparable economic interest in Hamm's book of business such that Allstate had to comply with the implied covenant of good faith and fair dealing in regards to Worthington. The same is true for the TPP: the TPP is based in the EA Agreement, which only Hamm signed, and no TPP was owed to Worthington. The defendants do not respond to this argument, but center their arguments around the EA Agreement all the same by stating that Allstate breached by "failing to pay *Hamm* the balance of TPP payments owed to *her*" and sought to "deprive *Hamm* of the fruits of *her* contract" in regards to selling the book of business. (Doc. 70 at 1, 6) (emphases added). Because the defendants failed to address this issue in response to a motion for summary judgment, they seemingly have abandoned Worthington's and WIG's claims. *See Brown v. VHS of Michigan, Inc.*, 545 F. App'x 368, 372 (6th Cir. 2013). More importantly, though, Worthington did not sign an EA Agreement. Therefore, the defendants' counterclaims are actually just Hamm's counterclaims. Allstate's motion for summary judgment will be granted as to defendants Worthington and WIG.

a computer she owned while working with Allstate and she did not erase the files. (Doc. 61 at 12-13). Allstate also points out that Hamm told friends, family, and acquaintances that she opened a new insurance agency before her non-solicitation provision had expired. (*Id.* at 13-14).

Both of these facts may be true, but they are irrelevant without more. Allstate cannot rely on conjecture to conclude that, because Hamm retained her computers, she *must* have retained confidential information. Allstate focuses on the fact that they did not erase the files on the computer prior to using them, but Allstate does not establish that there was anything that needed to be erased. Hamm clearly testified that they had not downloaded any Allstate information onto their computers and Allstate does not refute this. (Hamm Dep., Doc. 53 at 40).

As for discussing her new business with friends, family, and acquaintances, this does not violate the non-solicitation provision. Hamm was contractually prohibited from soliciting people who were Allstate customers at the time of her termination and those "whose identity was discovered as a result of access to confidential information of the Company." (Doc. 1-1 at 42). As an initial matter, it is not clear that these communications would qualify as solicitation; she testified to only telling them that they were opening a new business. (Hamm Dep., Doc. 53 at 112). Moreover, it is undisputed that none of these people were Allstate customers. (*Id.*). It also goes without saying that one does not discover the identity of their family or friends by using a former employer's confidential information.

There is no evidence that Hamm breached either of these provisions. If a party did not actually breach the contract, the other party is still bound by the terms of the agreement. *See Pace*, 150 S.W.3d at 66-67. Allstate does not deny that it stopped paying Hamm the TPP. (Doc. 61 at 4). Hamm moved for summary judgment on her own claim of breach and, while this has a higher burden, she is entitled to summary judgment on this record. *See Surles*, 678 F.3d at 455-56. It is

clear that Allstate stopped paying the TPP when it cannot establish that Hamm breached. Thus, Hamm's motion for summary judgment on her claim for breach will be granted.

However, the roles are reversed when it comes to Hamm's claim for the breach of the implied covenant of good faith and fair dealing: Allstate is entitled to summary judgment on this claim and Hamm's motion will be denied. Allstate correctly argues that this implied covenant does not create a standalone cause of action. Doc. 61 at 7; *KSA Enters., Inc. v. Branch Banking & Tr. Co.*, 761 F. App'x 456, 460 (6th Cir. 2019) (internal citations omitted). Yet, "[i]n every contract there is an implied covenant of good faith and fair dealing. Indeed, it may be said that contracts impose on the parties thereto a duty to do everything necessary to carry them out." *Ranier v. Mount Sterling Nat'l Bank*, 812 S.W.2d 154, 156 (Ky. 1991). Therefore, while a breach of this covenant will not create its own cause of action, "it may serve as the basis for a breach of contract claim." *KSA Enters., Inc.*, 761 F. App'x at 460 (internal citations omitted). The party must "provide evidence sufficient to support a conclusion that the party alleged to have acted in bad faith has engaged in some conduct that denied the benefit of the bargain originally intended by the parties." *Id.* at 461 (internal quotations omitted). This burden is especially difficult when the offending party acted pursuant to the express terms of the contract because "it is not inequitable or a breach of good faith and fair dealing in a commercial setting for one party to act according to the express terms of a contract for which it bargained." *Epps Chevrolet Co. v. Nissan N. Am. Inc.*, 99 F. Supp. 3d 692, 703 (E.D. Ky. 2015) (internal quotations and alteration omitted).

Hamm argues[12] that Allstate breached by denying potential buyers for her book of business since she would have received better prices if she had been able to sell to these buyers. (Doc. 50

---

[12]In her counterclaims, Hamm also included her termination as grounds for breach of this implied covenant. (Counterclaims Doc. 23 ¶¶ 55, 58). However, at her deposition, Hamm testified that she did not dispute that Allstate's termination for her failure to obtain these licenses was lawful. (Hamm Dep., Doc. 53 at 104-05). Her motion for

at 38-39). Hamm believes that Allstate was motivated to deny buyers because it benefited through paying the TPP and paying lower commissions to agents who received her clients upon redistribution. (Doc. 70 at 5). Allstate's bad faith, according to Hamm, is particularly evident in the fact that Grothaus was rejected as a potential buyer but then received some of Hamm's clients once Allstate had bought the book. (Doc. 50 at 38).

However, the EA Agreement allowed Allstate to approve or disapprove any potential buyer. (Doc. 52-1 at ALLSTATE-000076). In order to be approved, current Allstate agents had to meet certain qualifications to be considered, and Conlan and Barnett both explained that none of Hamm's identified buyers met those qualifications. (Barnett Dep., Doc. 55 at 99; Conlan Dep., Doc. 56 at 34, 37, 51). Hence, Allstate was acting under the express terms of their Agreement when it rejected Worthington, Philipo, and Grothaus.

Further, Conlan was the ultimate decisionmaker for approving buyers and he testified that he never knew the prices that Hamm had discussed with these buyers—a point that Hamm does not refute. (Conlan Dep., Doc. 56 at 36, 38). Thus, for each buyer, Allstate had legitimate reasons to reject them without any consideration of the profit Hamm stood to gain. While Hamm takes umbrage with Allstate's recommendation of Farrar since his offer was low, Allstate, again, was not involved in discussing Farrar's price and there are no facts that indicate Allstate approved Farrar *because* it knew Hamm would reject his offer. (*See id.* at 44-45). The fact that Allstate presented any approved buyer to Hamm undercuts her claim on this theory, as well, since Allstate was not required to offer any approved buyers. (*See* Worthington Dep., Doc. 54 at 96-97; Doc. 52-1 at ALLSTATE-00077).

---

summary judgment on this claim focuses solely on Allstate's behavior in rejecting her three proposed buyers. (Doc. 50 at 37-40; Doc. 70 at 4-7).

While Allstate was able to pay lower commission rates by reassigning clients after Hamm took the TPP, it incurred an additional payment that it would have avoided if Hamm had sold to another buyer—the TPP itself. Through Hamm's acceptance of the TPP, Allstate was obligated to pay her a series of payments that would have otherwise been avoided. (*See* Conlan Dep., Doc. 56 at 74-75). Additionally, both Conlan and Barnett testified that, in their views, it was better for an agent to sell her book to another agent because the agents receive more money. (*Id.*; Barnett Dep., Doc. 55 at 83-85). Thus, Allstate through its representatives expressed a preference for selling the book rather than paying the TPP.

Hamm may feel as though she had no choice but to accept the TPP, but this does not mean that Allstate deprived her the benefit of her bargain. Hamm entered into a contract that clearly contemplated this result. For this reason, Allstate did not breach the implied covenant of good faith and fair dealing and Allstate's motion is granted on this count while Hamm's is denied.

### 3. The defendants are entitled to summary judgment on Allstate's trade secret claims.

Allstate's claims under the federal Defend Trade Secrets Act ("DTSA") and the Kentucky Uniform Trade Secrets Act ("KUTSA") also fail. Allstate claims that the defendants misappropriated its trade secrets by refusing to return confidential information and using that to solicit customers. (*See* Doc. 1 ¶¶ 122-25, 139). Allstate's claims center around the February 1, 2017, letter and client information that was allegedly retained and used in order to send these letters. (*See* Doc. 71 at 10; Doc. 50 at 27).

"Kentucky's trade secret protection is nearly identical to the DTSA." *C-Ville Fabricating, Inc. v. Tarter*, No. 5:18-cv-379-KKC, 2019 WL 1368621, at *14 (E.D. Ky. Mar. 26, 2019). Under both statutes, there must be a trade secret which is misappropriated. *Id.*; *see also* 18 U.S.C. §

1836(b)(1) (creating a private cause of action when one's trade secret is misappropriated by another).

The defendants correctly note "there is absolutely no admissible evidence indicating that the Defendants retained Allstate files" and, instead, the record reveals that they used proper means to obtain client information. (Doc. 50 at 26-27). Misappropriation is defined similarly under both statutes.[13] As explained at length in prior sections, Allstate has no evidence to support any claim that the defendants improperly retained, used, or disclosed its information. *See Auto Channel Inc., v. Speedvision Network, LLC*, 144 F. Supp. 2d 784, 796 (W.D. Ky. 2001) ("Plaintiffs must have evidence from which a reasonable jury could find that under [the] KUTSA, Defendants misappropriated their ideas and did not independently discover these licensing opportunities."). Hamm and Worthington have undisputed testimony that they did not download any information onto computers; retain any physical files; or use any Allstate property when creating the February 1, 2017 letters.

---

[13] Under the DTSA, "misappropriation" is
    (A)  Acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or
    (B)  Disclosure or use of a trade secret of another without express or implied consent by a person who—
        (i)        Used improper means to acquire knowledge of the trade secret;
        (ii)      At the time of disclosure or use, knew or had reason to know that the knowledge of the trade secret was—
            (I)   Derived from or through a person who had used improper means to acquire the trade secret;
            (II)  Acquired under circumstances giving rise to a duty to maintain the secrecy of the trade secret or limit the use of the trade secret; or
            (III) Derived from or through a person who owed a duty to the person seeking relief to maintain the secrecy of the trade secret or limit the use of the trade secret; or
        (iii)     Before a material change of the position of the person, knew or had reason to know that—
            (I)   The trade secret was a trade secret; and
            (II)  Knowledge of the trade secret had been acquired by accident or mistake.
18 U.S.C. § 1839(5)(B); *see also* KRS § 365.880(2) (defining misappropriation in nearly identical terms).

Further, these client lists are not protectable trade secrets under either statute. Both define trade secrets in nearly identical ways and necessitate that the content derive "independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use[.]" KRS § 365.880(4)(a); *see also* 18 U.S.C. § 1839(3)(B). It is first worth clarifying what information is at issue here. In its response, Allstate defines its customer information as "information about particular customers and *the proprietary rates offered* to them by Allstate." (Doc. 71 at 10) (emphasis added). There is no evidence whatsoever that the defendants used any sort of information regarding proprietary rates, however. Thus, the only information that could conceivably be claimed by Allstate in this matter are names and addresses.

The Sixth Circuit has provided guidance in determining if client lists qualify as trade secrets under the KUTSA and said that they can be protectable trade secrets in certain instances: "courts generally distinguish between, on one hand, lists of customers discoverable only through extraordinary efforts and through many years' expenditure of time and money, . . . or the purchasers of unusual goods or services not generally known to an industry at large, and, on the other hand, lists of customers whose identities as purchasers of a given type of product may be obtained through such legitimate channels as telephone books, the internet, or by calling local businesses." *ATC Distrib. Grp., Inc. v. Whatever It Takes Transmissions & Parts, Inc.*, 402 F.3d 700, 714 (6th Cir. 2005) (internal quotations and citations omitted). Lower courts have found that client lists can be trade secrets. *See Church Mut. Ins. Co.*, 2017 WL 5987691, at *3. However, the information in *Church Mutual* included contact information as well as policy expiration dates and future price increases. *Id.* The court acknowledged that some of this information may have been

readily available, but other information—"particular[ly]" the price increases—was not and found that the information as a whole was protectable. *Id.*

Here, as explained above, the only potential trade secrets are client names and addresses. These can easily be obtained through proper means. In a case cited by the Sixth Circuit as an example of when a client list is not protectable, the North Carolina Court of Appeals stated that "[i]ndeed, any information used to contact the clients would have been easily accessible to defendant through a local telephone book." *Novacare Orthotics & Prosthetics East, Inc. v. Speelman*, 528 S.E.2d 918, 922 (N.C. Ct. App. 2000); *see also UBS Painwebber, Inc. v. Aiken*, 197 F. Supp. 2d 436, 447 (W.D.N.C. 2002) (applying *Novacare* to find that client lists utilizing names and addresses are not trade secrets).

The Court therefore finds that these client lists are not trade secrets. It would not require "extraordinary efforts" and "many years' expenditure of time and money" to, first, find the means by which a person could be contacted and, second, reach out to someone in order to discover their current insurance coverage and any potential needs. A simple phone call would likely reveal the desired information. *See ATC Distrib. Grp., Inc.*, 402 F.3d at 714-15 ("Even the name of the person at each transmission shop responsible for buying parts, to which ATC ascribes great importance, can be ascertained simply by calling each shop and asking."). The defendants' motion for summary judgment on Allstate's trade secret claims (Counts III and IV) will be granted.

**4. The defendants are entitled to summary judgment on Allstate's tortious interference with a contractual relationship since there is no evidence establishing that any defendant breached their contracts with Allstate.**

Allstate brought a claim against WIG for tortious interference with Hamm's and Worthington's contractual relationships they owed to Allstate. (Doc. 1 at ¶¶ 147-152). This claim has six elements: (1) existence of a contract; (2) defendant's knowledge of that contract; (3)

defendant's intent to cause a breach of that contract; (4) that defendant's actions actually caused a breach; (5) that plaintiff suffered damages as a result of the breach; and (6) that defendant was not privileged or justified in his conduct. *Seeger Enters v. Town & Country Bank & Tr. Co.*, 518 S.W.3d 791, 795 (Ky. Ct. App. 2017). Additionally, there must be "malice or some significantly wrongful conduct" in order to satisfy this claim. *Id.* (internal quotations omitted).

Actual breach of the contract is a "critical element" of this claim. *Ventas, Inc. v. Health Care Prop. Inv'rs, Inc.*, 635 F. Supp. 2d 612, 619 (W.D. Ky. 2009). This is where Allstate's claim fails. Because Allstate cannot establish a genuine dispute regarding whether there was an actual breach, the "critical element" of this claim is absent. Therefore, the defendants' motion on this claim (Count V) will be granted.

> **5. The defendants are entitled to summary judgment on Allstate's tortious interference with business relationships claim because there is no evidence to establish any improper motive through retaining and using confidential information.**

Allstate also brought a claim against all defendants for tortious interference with business relations, but this claim fails for similar reasons. This requires six elements: "(1) the existence of a valid business relationship or expectancy; (2) that the defendant was aware of this relationship or expectancy; (3) that the defendant intentionally interfered; (4) that the motive behind the interference was improper; (5) causation; and (6) special damages." *PBI Bank, Inc. v. Signature Point Condos., LLC*, 535 S.W.3d 700, 715 (Ky. Ct. App. 2016) (internal citation omitted). A plaintiff must show malice or some significantly wrongful conduct. *Id.*

The defendants argue that Allstate's claim fails at the improper motive element. (Doc. 50 at 31). Allstate alleged in its Complaint that the defendants interfered with its relationships with its customers by using confidential information to solicit those customers. (Doc. 1-1 at ¶ 161).

While similar behavior of using a previous employer's client information created an issue of fact in other cases, it did so when there was credible information that the offending party had actually violated non-solicitation and non-disclosure provisions. *Church Mut. Ins. Co.*, 2017 WL 5987691, at *1, *4. Here, Allstate has no admissible evidence that the defendants did what it alleges—use Allstate's confidential information to solicit customers. No identified witness, either an Allstate customer or Allstate employee, stated that they had reason to believe the defendants retained confidential information. (*See, e.g.*, Fryman Dep., Doc. 59 at 57, 62-63; Caldwell Dep., Doc. 60 at 60; Conlan Dep., Doc. 56 at 60).

In response to the defendants' motion, Allstate simply argues that questions of motive should be resolved by a jury.[14] (Doc. 71 at 11). While Allstate might be correct in some instances, Allstate's claim in the current matter is premised on allegations that center around whether the defendants actually retained and used its confidential information improperly. This is a claim that is entirely capable of being supported by the record at the summary judgment stage—Allstate just fails to do so. The defendants' motion on this count will be granted.

6. **The defendants are entitled to summary judgment on Allstate's unfair competition claim because there is no genuine issue on whether they deceived the public and caused others to believe the defendants' services were actually Allstate's services.**

Allstate's final claim is that of unfair competition. As the defendants point out, unfair competition is limited in Kentucky to trademark issues or other deceptive practices. "The essence of the wrong is the sale of one's own goods for those of another person . . . [t]he classic case of course is when the defendant uses a name or symbol to identify products for the obvious purpose of capitalizing on the good will created by a competitor in the same line of business." *Covington*

---

[14] Courts resolve this element at the summary judgment stage despite the fact that it involves motive. *See Monumental Life Ins. Co. v. Nationwide Ret. Sols, Inc.*, 242 F. Supp. 2d 438, 450 (W.D. Ky. 2003).

*Inn Corp. v. White Horse Tavern, Inc.*, 445 S.W.2d 135, 137-38 (Ky. 1969) (internal quotation omitted). "Underlying the whole theory is the matter of actual or intended deception of the public for business reasons." *Id.* at 139.

Courts are overwhelmingly hesitant to apply unfair competition in situations beyond those contemplated in *Covington Inn*—cases where consumers are deceived by the defendant's efforts to gain from another's business reputation. *See, e.g.*, *ACT for Health v. United Energy Workers Healthcare Corp.*, No. 5:15-CV-00195-TBR-LLK, 2018 WL 2090819, at *6 (W.D. Ky. May 4, 2018) ("[T]he only cases in which unfair competition claims have been successful in Kentucky is in the realm of trademarks."); *Raheel Foods, LLC v. Yum! Brands, Inc.*, No. 3:16-CV-00451-GNS, 2017 WL 217751, at *7 (W.D. Ky. Jan. 18, 2017) ("The opinion as a whole does not support Plaintiffs' broad conception of unfair competition because it makes clear that actual or intended deception of the public is an 'essential element' of the tort."); *Steir v. Motorists Mut. Ins. Co.*, No. 3:09-CV-846-S, 2010 WL 2228293, at *3 (W.D. Ky. June 3, 2010) (interpreting *Covington Inn* as "mak[ing] equally clear that actual or intended deception of the public is an 'essential element' of the tort while interpreting unfair competition in a contract).

The authorities do not extend unfair competition to any fact pattern similar to that here. Allstate argues that, because Fryman did not know Hamm no longer worked for Allstate when he contacted her and she "did nothing to dispel that misconception," the defendants actually misled Fryman. (Doc. 71 at 11). However, this does not go as far as Allstate hopes. Hamm testified that they had not told their customers they were leaving Allstate and opening a new business. (Hamm Dep., Doc. 53 at 94-95). The fact that Fryman continued to believe Hamm worked with Allstate supports this statement. Since Fryman had not heard anything to the contrary, he reasonably believed that Hamm still worked for Allstate when he contacted her. This does not constitute

deception. Because Allstate has not alleged facts that have been recognized as unfair competition under Kentucky law, the defendants' motion on this claim will be granted.

*Conclusion*

Therefore, having reviewed this matter, and the Court being otherwise advised, **IT IS ORDERED** that:

(1) The Court's prior Order (Doc. 79) be, and is hereby, **VACATED**;

(2) The defendants' Motion for Summary Judgment (Doc. 50) is **granted** in part and **denied** in part;

(3) The defendants' Motion for Summary Judgment is **granted** as to all of Plaintiff's Claims;

(4) The defendants' Motion for Summary Judgment is **granted** as to Count II of their Counterclaims for Counter-Plaintiff Hamm;

(5) The defendants' Motion for Summary Judgment is **denied** as to Count I of their Counterclaims;

(6) The defendants' Motion for Summary Judgment is **denied** as to Counter-Plaintiffs Worthington and WIG;

(7) Plaintiff's Motion for Summary Judgment (Doc. 61) is **granted** in part and **denied** in part;

(8) Plaintiff's Motion for Summary Judgment is **granted** as to Counter-Plaintiffs Worthington and WIG on both Counts of the Counterclaims;

(9) Plaintiff's Motion for Summary Judgment is **granted** as to Count I of the Counterclaim;

(10) Plaintiff's Motion for Summary Judgment is **denied** as to Count II of the Counterclaim for Counter-Plaintiff Hamm;

(11)    All pending motions in limine (Docs. 93, 99, 100-115) be, and are hereby,

**DENIED AS MOOT**; and

(12)    Defendant Hamm has **two weeks** to tender a proposed judgment to the Court.

Allstate will thereafter have **five days** in which it can file any objections to Hamm's

proposed judgment.


This 23rd day of March 2020.



Signed By:

***William O. Bertelsman***

**United States District Judge**